The CHIEF JUSTICE
delivered the. opinion of the court.
That the rebellion against the national Government, which, in April, 1861, took the form of assault on Fort Sumter, had, before the end of July, assumed the character and proportions of civil war; and that the blockade, established under the President’s proclamation, affected all neutral commerce, from that time, at least, with- its obligations and liabilities, are propositions which, in this court, are no longer open to question. They were not more explicitly affirmed by the judges who concurred in the judgment pronounced in the prize cases at the December Term, 1862, than by the judges who dissented from it.
The Government of the United States, involved in civil war, claimed the right to close, against all commerce, its own ports seized by the rebels, as a just and proper-exercise of ..power for the suppression of attempted revolution. It insisted, and yet insists, that no one could "justly complain if that power should be decisively and peremptorily exerted. In deference, however, to the .views of the principal commercial nations, this right was waived, and a commercial blockade established. It-was, expected that this blockade, effectively maintained, ^wohld he scrupulously respected by nations and individuals who declared themselves neutral.
*149 Of the various propositions asserted and controverted in the discussion of the cause now under consideration, two only need be examined in order to a correct understanding of its merits. It is insisted for the captors,
1. That on the 4th of May, 1862, the port of New Orleans was under blockade.;
2. That the Circassian, with a cargo destined for New Orleans, was then sailing with intent to violate that blockade, and therefore liable to capture as naval prize.
Both propositions are denied by the claimants. We shall consider them in their order.
First, then, was the port of New Orleans under blockade at the time of the capture ?
The city of. New Orleans, and the forts commanding its approaches from the Gulf, w,ere captured during the last days of April, 1862, and military possession of the city was taken on the 1st of May. Did this capture of the forts and military occupation of the city terminate the blockade of the port ?
' The object of blockade is to destroy the commerce of the enemy, and cripple his resources by arresting the import of supplies and the export of products. It may be made effectual by batteries ashore as well as by ships afloat. In the case of an inland port, the. most effective blockade would be maintained by batteries commanding the river or inlet by which it may be approached,- supported by a naval force sufficient to warn off innocent, and capture offending vessels attempting to enter.
The capture of the forts, then, did not terminate the blockade of New Orleans, but, -on the contrary, made it more complete and absolute.
Was it terminated by the military occupation of the city?
The blockade of the ports of the insurgent States was declared from the first by the American Government to be a blockade of the whole coast, and so it has been understood by all governments. The blockade of New Orleans was a part of this general blockade. It applied not to the city alone, but controlled the- port, which includes the whole *150 parish of Orleans, and lies on both sides of the Mississippi, and all the ports on that river and on the lakes east of the city.
Now, it may be well enough conceded that a continuous and complete possession of the city and the port, and of the approaches from the Gulf, would make a blockade unnecessary, and would supersede it. But, at the. time of the capture of the Circassian, there had been no such possession. Only the city was occupied, not the port, much less the district of country commercially dependent upon it, and blockaded by its blockade. Even the city had been occupied only three days.. It was yet hostile; the rebel army was in the neighborhood; the occupation, limited and recent, was subject to ah the vicissitudes of war: Such an occupation could not at once, of itself, supersede or suspend the blockade. It might ripen into a possession which would have that effect, and it did; but at the time of the capture it operated only in 'aid and completion of the naval investment.
[There is a distinction between simple and public blockades which supports this conclusion. A 'simple blockade may be established by a naval officer, acting upon his own discretion or under direction of superiors, without governmental notification; while a public blockade is uot only established in fact, but is notified, by the government directing it, to other Governments. In the case of a simple blockade, the captors Are hound to prove its existence at'the time of capture; while in-the case of a public blockade,.the claimants are held to .proof of discontinuance in order fo protec themselves from the penalties of attempted violation. The blockade of the rebel ports was and is of the latter sort. It was legally established and regularly notified by the American' Government to the neutral governments. Of such blockade, it was well observed by Sir William Scott: “ It must be conceived to exist till the revocation of it is actually nótified.” The blockade of the rebel ports, therefore, must be presumed to have continued until notification of discontinuance.*
*151 It is, indeed, the duty- of tbe belligérent government to give prompt notice; and if it fails to do so, proof of discontinuance may be otherwise mtide; but, subject to just responsibility to other nations, it must judge for itself wben it can dispense witb blockade. It must decide wben tbe object of blockade, namely, prevention of commerce witb enemies, can be .attained by military force, or, wben tbe enemies are rebels, by military force and municipal law, without tbe aid of a blockading force. -The Government of tbe United States acted on these views. Upon advice óf tbe capture of New Orleans, it decided that tbe blockade of tbe port; might be safety dispensed witb, except as to contraband of war, from' and after the 1st of June.' Tbe President, therefore, on the 12th of May, issued bis proclamation to that effect, and its terms were undoubtedly notified to neutral powers. This, action of tbe Government must, under tbe circumstances of this case, be held to be conclusive evidence that tbe blockade of New Orleans was not terminated by military occupation on the'4tb of May. New Orleans, therefore, was under blockade wben the Circassian was captured.
It remains to be considered whether tbe ship and cargo were then liable to capture as prize for attempted violation of that blockade.
• It is a well-established principle of prize law, as administered by tbe courts, both of the United States and Great Britain, that sailing from a neutral port witb intent to enter a blockaded port, and witb knowledge of tbe existence' of tbe blockade, subjects tbe vessel and, in most cases, its cargo to capture and condemnation.* We are entirety satisfied witb this rule. It was established,, witb some hesitation, wben sailing vessels were tbe only vehicles of ocean commerce; but now, when steam and electricity have made all nations neighbors, ■ and blockade running from neutral ports seems to have been organized as a business, *152 and almost raised to a profession, it is clearly seen to be indispensable to -the efficient exercise of belligerent rights; It is not likely to be abandoned.until the nations, by treaty, shall • consent to abolish capture of private property .on the seas, and with it the whole law and practice of commercial blockade.
Do the Circassian and her cargo come within this rule ?
The Circassian was chartered at Paris on the 11th of February, 1862, by Z. C. Pearson & Co. to J. Soubry, agent, and the charter-party' contained a- stipulation that she should proceed to Havre qr Bordeaux, and, being loaded, proceed thence with her cargo to -Havana, -Nassau, or Bermuda, and thence to a.port in America and “ run the blockade,, if so ordered by the freighters.” "With this charter-party was found on the ship, at the time of capture, a memorandum, of affreightment given to Bouvet, one. of the shippers, and signed “For account and witli authority of J. Soubry,— Laibert, Neveu,” and containing this engagement: “ Mr. J. Soubry engages to execute the charter-party of affreightment; that-is to say, that the merchandise shall not be dis-' embarked except at New Orleans, and to this effect he engages.to force the,blockade.” With this paper was the' following note, signed “ P. Desbordes“ Sent similar memorandum to thé forties concerned.” This P. Desbordes was the ship’s husband or agent at Bordeaux.
It is urged, on behalf of the claimants, that there is no evidence that Laibert had authority to act for Soubry; but the fact that the paper was found on the ship raises a jire-sumption that he had that authority, ánd puts the burden of proof 'to the contrary on the ^claimants. Besides, it appears, from a letter written by Bouvet, that he forwarded by the ship, inclosed with this letter, the bills of lading of the goods shipped by him, and also “ a copy of the charter-party and private memorandum,.” It can hardly be doubted that the copy of the charter-party in the record is this copy forwarded by Bouvet, or that the memorandum found with it is the private memorandum of which he writes. The éircumstanee that .a similar memorandum was .sent to. the parties con *153 cerned raises an almost irresistible presumption that the other, freighters shipped their merchandise un'der the same express stipulation'to force.the blockade.
It is hardly necessary to go further on the question of intent ; but if doubt .remained, it would be dispelled by an examination of the other papers and facts in the case. Every bill of lading contained a stipulation for the conveyance of goods described in it to Havana,fin order to receive orders as to their ulterior destination, and for their delivery at that destination on payment of freight.- Such, we think, is the true import of each bill before.us. Almost every letter found on board the ship and contained in the record, affords evidence of intent to force the blockade. These letters were written, at' Bordeaux, to correspondents at Havana and New Orleans, and speak of the steamer as “loaded entirely with our products for New Orleans;” as “ arrived hither a month since, to convey to your place, New Orlearis, by forcing the blockade, a very fine cargo;” as “ loaded in our port for New Orleans, whither'she will proceed after touching at Havana;” as “being a very fast sailer;” as “ going to attempt the entrance of your river, after previously touching at Havana;” as “bound to your port, New Orleans;” as “bound from Bordeaux to New Orleans;” and as “having engaged.to force the blockade.” Most of these, letters were written by shippers, and relate to merchandise described in one-or another of the bills of lading. Finally, it is proved that on the eve, and almost at the moment, of capture, the captain ordered the destruction of a..package of letters put on board the ship, after she had cleared from Bordeaux, at Panillac, a town on the Gironde, nearer the sea. These letters, doubtless, related 1p the ship, the. cargo, or the voyage, probably to all. ' Their destruction would be a strong circumstance against the ship and cargo, were the other facts.less convincing; taken in connection with them, it irresistibly compels belief of guilty intent at the time of sailing, and time of capture.
It was urged in argument that the ship was bound primarily to Havana, and might discharge her cargo there, and *154 should not be held liable to capture for an intent which would have been abandoned on her arrival at that place.
We agree, that if the ship had been going to Havana with an honest intent to ascertain whether the blockade of New Orleans yet remained in force, and with no design to proceed further if. such should prove to be the case, neither ship nor cargo would have-been subject to lawful seizure. But it is manifest that such was- not the intent. The existence of the blockade was known' at the inception of the voyage, and its discontinuance was not expected. The vessel was chartered and her cargo shipped with the purpose of forcing the blockade. The destination to Havana was merely coloi’able.- It proves nothing beyond a mere purpose to touch at that port, perhaps, .and, probably, with the expectation of getting information which would facilitate the success of the unlawful undertaking. It is quite possible that Havana, under the circumstances, would have turned out to be, as. was insisted in argument, a locus penilenlice ; but a place for repentance does not prove repentance before the place is reached. It is quite possible that the news which would have met the vessel. at Havana would have induced the master and shippers to abandon their design- to force the blockade by ascending the Mississippi; but future possibilities cannot change present conditions. Nor is it at all certain that the purpose to break the blockade would have been abandoned. On the contrary, it is, quite possible that the, “ulterior destination” mentioned in the bills of lading would have been changed to some other blockaded port. But this is not important. Neither possibilities nor probabilities could change the actual intention one way or another. At the time of capture, ship and cargo were on their way to New Orleans, under contract that the cargo should be discharged there and not elsewhere, and that the blockade should be forced in order to the fulfilment of that contract. This condition made ship and cargo then and there lawful prize.
There was some, attempt, in argument, to distinguish that •portion of the cargo shipped by "William Burrows from the *155 remainder. "We dp not think it can be so distinguished. The bill of lading of the goods shipped by him is expressed in the same terms as the bills of goods shipped by others, and Burrows himself states that he received it from P. Des-bordes & Co., — the same Desbordes who sent “ to the other parties” memorandums similar to that which was given to Bouvet, and which stipulated for breach of blockade.- There is no indication in the bill of lading that any one. except Burrows had any interest in these goods, and no testimony except his own to that effect. Against the strong circumstances which tend to prove that they were in equal fault with all -the rest, his not very unequivocal statement, that they were destined for sale in Havana, cannot prevail.
The decree of the District Court, condemning the vessel and cargo as lawful prize, must be
Affirmed.

 The Betsey, Goodhue, Master, 1 Robinson, 282; The Neptune, Id. 144.

 Yeaton v. Fry, 5 Cranch, 335; 1 Kent’s Commentaries, 150 ; The Frederick Molke, 1 Robinson, 72; The Columbia, 1 Id. 130; The Neptune, 2 Id. 94.