# THE PEDRO.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 115.   Argued November 2, 3, 1899. — Decided December 11, 1899.

On the 20th of April, 1898, a joint resolution of Congress was approved by the President declaring that the people of Cuba are, and of right ought to be, free and independent.   On the same day the Minister of Spain at Washington demanded his passport, and the diplomatic relations of Spain with the United States were terminated.   On the 22d of the same April a blockade of a part of the coast of Cuba was instituted.   On the 23d of the same month, in a proclamation of the Queen Regent of Spain it was declared that a state of war was existing between Spain and the United States.   On the 26th of the same month the President issued a proclamation, declaring that a state of war existed between the United States and Spain, the fourth and fifth articles of which proclamation were as follows :
" 4.   Spanish merchant vessels in any ports or places within the United States shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship shall be permitted to continue their voyage if, on examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term ; Provided, that nothing herein contained shall apply to the Spanish vessels having on board any officers in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage), or any other article prohibited or contraband of war, or any dispatch of or to the Spanish Government."   " 5.   Any Spanish merchant vessel which, prior to April 21, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place and to discharge her cargo, and afterwards forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voy-

age to any port not blockaded." The Pedro was built in England, sailed under the British flag till 1887, and then was transferred to a Spanish corporation, and sailed under the Spanish flag. Sailing from Antwerp she arrived at Havana with a cargo April 17, 1898. She remained there five days, discharged her cargo and left for Santiago April 22. At 6 o'clock on that evening, when about 15 miles east of the Morro, and 5 miles north of the Cuban coast, she was captured by the New York, of the blockading fleet, sent to Key West, and there libelled and condemned. *Held*,

(1) That the language of the proclamation was plain, and not open to interpretation;

(2) That the Pedro did not come within Article 4 of the proclamation ; nor within Article 5 ; nor within the reasons usually assigned for exemption from capture ;

(3) That it must be assumed that she was advised of the strained relations between the United States and Spain;

(4) That being owned by a Spanish corporation, having a Spanish registry, and sailing under a Spanish flag and a Spanish license, and being officered and manned by Spaniards, she must be deemed to be a Spanish ship, although she was insured against risks of war by British underwriters — that fact being immaterial.

THIS was an appeal from a decree of the District Court of the United States for the Southern District of Florida condemning the steamer Pedro as lawful prize of war on a libel filed April 23, 1898.

April 20, 1898, the President approved the following joint resolution :

"First. That the people of the Island of Cuba are, and of right ought to be, free and independent.

"Second. That it is the duty of the United States to demand, and the Government of the United States does hereby demand, that the Government of Spain at once relinquish its authority and government in the Island of Cuba and withdraw its land and naval forces from Cuba and Cuban waters.

"Third. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry these resolutions into effect.

"Fourth. That the United States hereby disclaims any dis-

position or intention to exercise sovereignty, jurisdiction or control over said Island except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the Island to its people." 30 Stat. 738.

On the same day, the Minister of Spain to the United States requested and obtained his passports; the text of the resolution was cabled to the Minister of the United States at Madrid; and the Secretary of State by separate dispatch directed him to communicate the resolution to the Government of Spain with the formal demand of the United States therein made, and the notification that, in the absence of a response by April 23, the President would proceed without further notice to use the power and authority enjoined and conferred upon him.

April 21, the Minister of the United States at Madrid acknowledged the receipt of the Secretary's dispatch that morning, but saying that before he had communicated it he had been notified by the Minister of Foreign Affairs of Spain that diplomatic relations were broken off  between the two countries, and that he had accordingly asked for his passports. The letter from the Minister of Foreign Affairs of Spain referred to was as follows:

"In compliance with a painful duty I have the honor to inform Your Excellency that the President having approved a resolution of both Chambers of the United States, which in denying the legitimate sovereignty of Spain and threatening an immediate armed intervention in Cuba, is equivalent to an evident declaration of war, the Government of His Majesty has ordered its Minister in Washington to withdraw without loss of time from the North American territory, with all the personnel of the Legation. By this act the diplomatic relations which previously existed between the two countries are broken off, all official communications between their respective representatives ceasing, and I hasten to communicate this to Your Excellency in order that on your part you may make such dispositions as seem suitable. I beg Your Excellency to acknowledge the receipt of this note at such time as you deem

proper, and I avail myself of this opportunity to reiterate to you the assurances of my distinguished consideration."

The Secretary of the Navy at once gave instructions to the commander in chief of the North Atlantic Squadron to "immediately institute a blockade of the North coast of Cuba, extending from Cardenas on the east to Bahia Honda on the west.; also, if in your opinion your force warrants, the port of Cienfuegos, on the south side of the island. . . . It is believed that this blockade will cut off Havana almost entirely from receiving supplies from the outside. . . . The Department does not wish the defences of Havana to be bombarded or attacked by your squadron."

April 22, Admiral Sampson, in command, instituted the blockade and on that day the President issued the following proclamation:

" Whereas, by a joint resolution passed by the Congress and approved April 20, 1898, and communicated to the Government of Spain, it was demanded that said Government at once relinquish its authority and government in the Island of Cuba, and withdraw its land and naval forces from Cuba and Cuban waters; and the President of the United States was directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States to such extent as might be necessary to carry said resolution into effect; and

" Whereas, in carrying into effect said resolution, the President of the United States deems it necessary to set on foot and maintain a blockade of the North coast of Cuba, including all ports on said coast between Cardenas and Bahia Honda and the port of Cienfuegos on the South coast of Cuba:

" Now, therefore, I, William McKinley, President of the United States, in order to enforce the said resolution, do hereby declare and proclaim that the United States of America have instituted, and will maintain a blockade of the North coast of Cuba, including ports on said coast between Cardenas and Bahia Honda and the port of Cienfuegos on the

South coast of Cuba, aforesaid, in pursuance of the laws of the United States and the law of nations applicable to such cases. An efficient force will be posted so as to prevent the entrance and exit of vessels from the ports aforesaid. Any neutral vessel approaching any of said ports, or attempting to leave the same, without notice or knowledge of the establishment of such blockade, will be duly warned by the Commander of the blockading forces, who will indorse on her register the fact, and the date, of such warning, where such indorsement was made; and if the same vessel shall again attempt to enter any blockaded port, she will be captured and sent to the nearest convenient port for such proceedings against her and her cargo as prize, as may be deemed advisable.

"Neutral vessels lying in any of said ports at the time of the establishment of such blockade will be allowed thirty days to issue therefrom." 30 Stat. 1769.

April 23 the Queen Regent of Spain issued a decree, in which, among other things, it was stated:

"Article I. The state of war existing between Spain and the United States terminates the treaty of peace and friendship of the 27th October, 1795, the protocol of the 12th January, 1877, and all other agreements, compacts and conventions that have been in force up to the present between the two countries.

"Art. II. A term of five days from the date of the publication of the present royal decree in the Madrid Gazette is allowed to all United States ships anchored in Spanish ports, during which they are at liberty to depart."

April 25, in response to a message from the President, Congress passed the following act, which was thereupon duly and at once approved:

"First. That war be, and the same is hereby, declared to exist, and that war has existed since the twenty-first day of April, Anno Domini eighteen hundred and ninety-eight, including said day, between the United States of America and the Kingdom of Spain.

"Second. That the President of the United States be, and

he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry this act into effect." 30 Stat. 364.

April 26 the President issued a further proclamation, as follows:

" Whereas, By an act of Congress, approved April 25, 1898, it is declared that war exists, and that war has existed since the 21st day of April, A.D. 1898, including said day, between the United States of America and the Kingdom of Spain; and

" Whereas, It being desirable that such war should be conducted upon principles in harmony with the present views of nations and sanctioned by their recent practice, it has already been announced that the policy of this Government will be not to resort to privateering, but to adhere to the rules of the declaration of Paris:

"Now, therefore, I, William McKinley, President of the United States of America, by virtue of the power vested in me by the Constitution and the laws, do hereby declare and proclaim:

" 1. The neutral flag covers enemy's goods, with the exception of contraband of war.

" 2. Neutral goods, not contraband of war, are not liable to confiscation under the enemy's flag.

. " 3. Blockades in order to be binding must be effective.

" 4. Spanish merchant vessels, in any ports or places within the United States, shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea, by any United States ship, shall be permitted to continue their voyage, if, on examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term; Provided, that nothing herein contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for the voyage), or any other article

prohibited or contraband of war, or any dispatch of or to the Spanish Government.

" 5. Any Spanish merchant vessel which, prior to April 21, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place, and to discharge her cargo, and afterwards forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voyage to any port not blockaded.

" 6. The right of search is to be exercised with strict regard for the rights of neutrals, and the voyages of mail steamers are not to be interfered with except on the clearest grounds of suspicion of a violation of law in respect of contraband or blockade." 30 Stat. 1770.

The steamship Pedro was built at Newcastle, England, in 1883, and, until 1887, sailed under British registry and the name of Lilburn Tower. In the latter year her name was changed to The Pedro, and she was transferred to La Compañia La Flecha, a Spanish corporation of Bilboa, Spain, and registered at that port in its name, and on October 4, 1887, obtained a royal patent from the Crown of Spain, which was issued to her as the property of the company. Thereafter she sailed under the Spanish flag and was officered and manned by Spaniards, though she was engaged in the transportation of cargo for hire as a merchant vessel under the management of G. H. Fletcher and Company of Liverpool. Her voyages began in Europe where she took cargo for Cuban ports, from which ports on discharge she proceeded to ports of the United States, where she took cargo for a port of discharge in Europe, the round trip occupying about three months. Between March 20 and March 25, 1898, she took on board at Antwerp, Belgium, some 2000 tons of cargo for Havana, Santiago de Cuba, and Cienfuegos, Cuba, of which 1700 tons was rice and the rest, hardware, empty bottles, paper, cement and general cargo.

On March 18, 1898, she was chartered to the firm of Keyser and Company, being described in the charter party as " now loading in Antwerp for Cuba," to proceed to Pensacola, Flor-

ida, or Ship Island, Mississippi, "with all convenient speed," to load a cargo of lumber for Rotterdam or Antwerp. The charter party provided that "should the vessel not be in all respects ready for cargo at her loading place on or before the 18th of May, 1898, charterers or their agents have the option of cancelling this charter. If required by charterers, lay days are not to commence at loading port before the 5th of May, 1898." Among the ship's papers was a bill of health issued by the consul of the United States at Antwerp, March 24, which described her as "engaged in Atlantic trade, and plies between Antwerp, Cuba and the United States." The bill of health concluded as follows: "I certify that the vessel has complied with the rules and regulations made under the act of February 15, 1893, and that the vessel leaves this port bound for Pensacola, in the United States of America, via Havana, Santiago & Cienfuegos." The steamer's freight list on the voyage to Cuban ports was valued at about $7000, stated to be barely sufficient to cover the expenses of receiving, transporting and delivering that cargo, and the charter hire on the contemplated voyage from Pensacola or Ship Island to Rotterdam would have been about $25,000.

The steamer arrived at Havana on April 17, and remained there for five days, discharging about sixteen hundred tons of her cargo, and taking on some twenty tons of general merchandise for Santiago. On April 22, at about half after three o'clock in the afternoon, she left Havana for Santiago, and at six o'clock, when about fifteen miles east of the Morro, at the entrance of Havana harbor, and five miles north of the Cuban coast, was captured by the cruiser New York, one of the blockading fleet, and sent to Key West in charge of a prize crew. There she was libelled on April 23.

In due course, proofs *in preparatorio,* which embraced the ship's papers and the depositions of her master and first officer, were taken. The master appeared in behalf of the owners and made claim to the vessel, and moved the court for leave to take further proofs, presenting with the motion his test affidavit. In the affidavit it was alleged that, although a majority of the stock of La Compañia La Flecha was registered in

the names of Spanish subjects and only a minority in the names of British subjects, (members of the firm of G. H. Fletcher and Company,) one of the latter had possession of all the certificates of stock, which under the charter of the company established the ownership thereof, whereby he was the "sole beneficial owner of the said steamer Pedro." And further that the steamer was transferred from the British to the Spanish registry solely for commercial reasons, "there being discriminations in favor of vessels carrying the Spanish flag in respect of commerce with the colonies of Spain, in consideration of dues paid by such steamers to the government of Spain," but that it was the intention of the British stockholders to withdraw her from the Spanish registry and from under the Spanish flag, and restore her to the British registry and the flag of Great Britain whenever the trade might be disturbed. It was also alleged that the steamer was insured "against all perils and adventures, including the risks of war, for her full value by underwriters of Lloyds, London, and by insurance companies organized and existing under and pursuant to the laws of Great Britain, and that if the said vessel should be condemned as prize by this court the loss will rest upon and be borne by the said English underwriters."

The motion was denied, the cause heard on the pleadings and the proofs taken *in preparatorio*, and a decree of condemnation entered. Subsequently the Secretary of the Navy elected to take the vessel for the use of the United States pursuant to section 4624 of the Revised Statutes. By order of court she was duly appraised and delivered to the Navy Department, and the amount of her appraised value deposited with the Assistant Treasurer of the United States at New York, subject to the order of the District Court. From the decree of condemnation an appeal was prosecuted to this court.

*Mr. Wilhelmus Mynderse* for Bonet, claimant, appellant.

*Mr. James H. Hayden* for captors. *Mr. Joseph K. Mc-Cammon* was on his brief.

*Mr. Assistant Attorney General Hoyt* filed a brief for the United States.

Mr. Chief Justice Fuller delivered the opinion of the court.

When, on the twenty-second day of April, this Spanish steamer sailed from Havana, the United States and Spain were at war. Congress had adopted a resolution, April 20, demanding "that the Government of Spain at once relinquish its authority and government in the Island of Cuba and withdraw its land and naval forces from Cuba and Cuban waters," and directing and empowering the President "to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry these resolutions into effect." Time was given by the Executive until April 23 for Spain to signify compliance with the demand, but the Spanish Government at once, on April 21, recognized the resolution as "an evident declaration of war," and diplomatic relations were broken off. Blockade had been proclaimed April 22, and put into effective operation at Havana, and, immediately thereupon, elsewhere, under the proclamation. And by the act of Congress of April 25, it was declared that war had existed since the twenty-first day of April.

Being an enemy's vessel, the Pedro was liable to capture as lawful prize unless exempted therefrom by the terms of the proclamation of April 26. If that document in its bearing on this case could be regarded as ambiguous, a liberal construction might be indulged in, and it is urged that such liberality should in any event be accorded in view of the traditional policy of this Government in respect of the exemption of private property at sea during war.

In *The Phœnix*, 1 Spinks Eccl. & Adm. Rep. 306, 310; Spinks' Prize Cases, 1, 6, Dr. Lushington said in reference to the relaxation of belligerent rights by official action : "If the words of the document are capable of two constructions, then

I am clearly of opinion that the one most favorable to the belligerent party, in whose favor the document is issued, ought to be adopted; but the court must bear in mind that its province is not *jus dare*, but *jus dicere;* and I must again refer to the principle which I have often enunciated in this court, *verbis plane expressis omnino standum est.*"

As applicable here, the meaning of the language used appears to us plain, and the proclamation not open to interpretation, since none is needed; nor are we justified in expanding executive action by construction because of the diplomatic attitude of this Government in respect of the exemption of all property, not contraband, of citizens and subjects of nations at war with each other, an exemption which has not as yet been adopted into the law of nations.

It may be that the hardships incident to the contrary view will finally be found so destitute of corresponding advantage as to lead to the general acceptance of the doctrine so long unsuccessfully advocated by our statesmen and publicists, in diminution of the evils of war, but we must apply the law as it is, and not the law as they have contended it should be.

The Pedro did not come within the fourth article of the proclamation, for she was in Havana, a port of the enemy, on April 21, and not "in any port or place within the United States." She sailed from Havana for Santiago, another port of the enemy, on April 22, was captured that day, and reached Key West on April 23 as a prize of war. The suggestion that she was thus brought within the exemption requires no remark.

Nor did the fifth article of the proclamation exempt the Pedro. That article provided that "any Spanish merchant vessel which, prior to April 21, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place and to discharge her cargo, and afterwards forthwith to depart without molestation."

The Pedro remained in the harbor of Havana from the 17th until the 22d of April. We think it must be assumed that she was advised of the strained relations between the United States and Spain, and the imminency of hostilities. At all events,

she did not leave Havana until the day after that designated by Congress and the President as the day on which war actually began, and which was also so regarded by the Government of Spain. She had no cargo to be discharged at any port or place in the United States, but had cargo for Santiago and Cienfuegos, Cuban ports held by the Spanish forces, and she cleared, not for Pensacola, but for Santiago. She was not within the letter of the proclamation, nor within the reasons usually assigned for the exemption as pointed out in the opinion of the District Judge, 87 Fed. Rep. 927. She had not left a foreign port in ignorance of the perilous condition of affairs, and innocently taking a course which would subject her to our power by entering one of our ports. Neither was she bringing cargo to this country for the increase of our resources, or the convenience of our citizens. On the contrary, she was sailing from one port to another port of the enemy, and all the cargo she had on board was destined for the enemy's ports. Not only this, but she took on cargo at Havana for Santiago, and was captured while thus actually trading from one enemy port to another enemy port, being herself an enemy vessel. In these circumstances the fact that the Pedro was under contract to ultimately proceed, after concluding her visits to the Spanish ports, to a port of the United States, to there load for Europe, did not bring her within the exemption of the proclamation.

The doctrine as to continuity of voyage as laid down by this court in the cases cited by appellant has no application.

In *The Circassian*, 2 Wall. 135, it was ruled that the intent to violate a blockade, found as a fact, was not disproved by evidence of a purpose to call at a neutral port, not reached at time of capture, with ulterior destination to the blockaded port. In *The Bermuda*, 3 Wall. 514, the actual destination to a belligerent port, whether ulterior or direct, was held to determine the character of the transaction as a whole; that transhipment could not change the effect of the pursuit of a common object by a common plan; and that if the cargo was contraband its condemnation was justified, whether the voyage was to ports blockaded or to ports not blockaded; and so

as to the vessel in the former case. And in *The Springbok*, 5 Wall. 1, it was held that an intention to tranship cargo at a neutral port did not save it when destined for a blockaded port; that as to cargo, both in law and intent, the voyage from London to the blockaded port was one voyage, and that the liability attached from the time of sailing if captured during any part of that voyage. The solution of the question under consideration is not particularly aided by these and like decisions relating to blockade running and the transportation of contraband.

In *The Joseph*, 8 Cranch, 451, the American brig Joseph sailed from Boston with a cargo on freight April 6, 1812, on a voyage to Liverpool, and the north of Europe, and thence directly or indirectly to the United States. She discharged her cargo at Liverpool; then, under British license, she took a cargo from Hull to St. Petersburg, and there received news of the war between the United States and Great Britain. She afterwards sailed from St. Petersburg to London with a cargo consigned to merchants at that port, having delivered which, she sailed for the United States in ballast, and was captured not far from Boston Light, and sent into port for adjudication. Her trading with the enemy rendered her liable to condemnation as prize; but it was contended that the offensive voyage terminated at London, and that she was not taken *in delicto*. The court held, however, that whether her voyage were considered an entire one from the United States to England, thence to St. Petersburg, and thence to the United States, or as two distinct voyages, the homeward voyage being from St. Petersburg to the United States, with a deviation to London, she was captured during the same voyage in which the offence was committed, though after it was committed, and was still *in delicto*.

*The Argo*, 1 Spinks, 375; Spinks' Prize Cases, 52, so much relied on by counsel, was an entirely different case from that presented by this record. The Argo was a vessel belonging to a Russian owner, sailing under Russian colors, and bound on a voyage from Havana to Cork. Her charter party bore date February 7 at Havana, but it was therein stipulated that

she should load at Havana or Matanzas, demurrage not to be paid for forty-two running days. She took on sufficient ballast at Havana to keep her safe, and left there in February for Matanzas, where her cargo was begun to be put on board February 28 and was completed on March 30, and she cleared from that port April 2. March 29, 1854, the British Order in Council printed in the margin[1] was issued. Dr. Lushington, adhering to the views he had expressed in *The Phœnix, supra,* held that the order did not contemplate that the vessel should be *laden* at the date of sailing and that the voyage was commenced at Havana to end in Great Britain, notwithstanding she took cargo at Matanzas.

It was argued that the Pedro was not liable to capture and condemnation because British subjects were the legal owners of some and the equitable owners of the rest of the stock of La Compañia La Flecha, and because the vessel was insured against risks of war by British underwriters. But the Pedro was owned by a corporation incorporated under the laws of Spain; had a Spanish registry; was sailing under a Spanish

---

[1] "Her Majesty, being compelled to declare war against His Imperial Majesty the Emperor of all the Russias, and being desirous to lessen as much as possible the evils thereof is pleased by and with the advice of her Privy Council, to order, and it is hereby ordered, that Russian merchant vessels, in any ports or places within her Majesty's dominions shall be allowed until the tenth day of May next, six weeks from the date hereof, for loading their cargoes and departing from such ports or places; and that such Russian merchant vessels, if met at sea by any of her Majesty's ships, shall be permitted to continue their voyage, if on examination of their papers it shall appear that their cargoes were taken on before the expiration of the above term: Provided, that nothing herein contained shall extend to or be taken to extend to Russian vessels having on board any officer in the military or naval service of the enemy, or any article prohibited or contraband of war, or any despatch of or to the Russian Government.

"And it is hereby further ordered by her Majesty, by and with the advice of her Privy Council as aforesaid, that any Russian merchant vessel which, prior to the date of this order, shall have sailed from any foreign port bound for any port or place in her Majesty's dominions, shall be permitted to enter such port or place, and to discharge her cargo, and afterwards forthwith to depart without molestation; and that any such vessel, if met at sea by any of her Majesty's ships shall be permitted to continue her voyage to any port not blockaded."

flag and a Spanish license; and was officered and manned by Spaniards. Nothing is better settled than that she must, under such circumstances, be deemed to be a Spanish ship and to be dealt with accordingly. Story on Prize Courts (Pratt's Ed.) 60, 66, and cases cited. *The Friendschaft*, 4 Wheat. 105; *The Ariadne*, 2 Wheat. 143; *The Cheshire*, 3 Wall. 231; Hall Int. Law, § 169.

These stockholders were in no position to deny that when they elected to take the benefit of Spanish navigation laws and the commercial profits to be derived through discriminations thereunder against ships of other nations, they also elected to rely on the protection furnished by the Spanish flag. Nor can the alleged intention to restore the Pedro to British registry, if war rendered the change desirable, be regarded. That had not been done when the Pedro was captured.

In conclusion, we are of opinion that the court below did not err in refusing to allow further proofs to be taken. The Spanish ownership was made out, and the facts that the stock of the corporation belonged legally or equitably to British subjects or that the loss of the vessel would be eventually borne by British underwriters were immaterial. Nor was there any doubt as to the movements of the Pedro and the trading in which she was actually engaged. The conclusion reached by the District Court could not have been affected by the further proofs desired to be taken.

*Decree affirmed.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE BREWER, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM, dissenting.

The Pedro was a British-built ship, formerly owned and registered in Great Britain. About nine years prior to the 22d day of April, 1898, on which day the ship was captured, she was transferred to a Spanish corporation, took a license from the Spanish Government, and thereafter sailed under the Spanish flag. From the time when she thus became

a Spanish merchant vessel she followed a course of regular trade by sailing from some port or ports in Europe to some port or ports in the southern part of the United States, touching in so doing at several places in the Island of Cuba. Voyages of this kind were made for about nine years prior to the capture, the vessel usually consuming about three months in both the outward and return voyage, being thus able to make four trips each year between a European port and a port in the United States. On these voyages, as illustrated by the one on which she was engaged when captured, the business secured for the Cuban ports was accessory to the main object of the voyage, which was the procuring of a remunerative cargo in the United States. Prior to the journey to the United States, upon which she was captured, the Pedro had last been at the port of New Orleans in January, 1898, at which time she there paid the tonnage tax imposed by the act of Congress, the payment then made being the fourth for the year beginning March 2, 1897, showing that for the year prior to her capture she had been four times in a port of the United States and paid tonnage at such ports.

The Pedro, being in the port of Antwerp in March, 1898, took cargo for Havana, Santiago and Cienfuegos, in the Island of Cuba. Whilst the vessel was thus at Antwerp taking cargo for the Cuban ports in question, she was, on the 18th of March, 1898, through brokers at Liverpool, chartered by W. S. Keyser & Co., a firm of merchants established in Mobile and Pensacola, to proceed to Pensacola or Ship Island in the United States "*with all convenient speed*," there to take a cargo of lumber to be carried on the return voyage to Rotterdam. The opening clause of the charter described the vessel as now loading in Antwerp for Cuba, and the contract contained the stipulations usual to such agreements. It was provided that the charterers should not be obliged to commence loading the ship at Pensacola or Ship Island before the 5th of May, but that the loading should be completed in sixteen working days, and that if the vessel did not arrive at her point of destination in the United States on or before the 18th day of May, 1898, the charterers should have the

option of cancelling the contract. Although the vessel had a capacity of about five thousand tons measurement, the cargo which was taken at Antwerp for the Cuban ports was only about two thousand tons, less than half her capacity, and the entire freight on such cargo did not exceed seven thousand dollars, which was barely sufficient to meet the expense of receiving, transporting and delivering. On the other hand, the freight on the lumber to be taken at either the port of Pensacola or Ship Island, at the rates fixed in the charter party, would have amounted to about twenty-five thousand dollars. The ship sailed on her voyage on the 25th of March, 1898. Before doing so she took from the American consul at the port of Antwerp a bill of health as required by the laws of the United States. In this bill of health the vessel was described as one " engaged in Atlantic trade, and plies between Antwerp, Cuba and the United States;" and the consul besides certified that the " vessel has complied with the rules and regulations made under the act of February the 15th, 1893, and that the vessel leaves this port bound for Pensacola in the United States of America via Havana, Santiago and Cienfuegos." She arrived at Havana on the 17th of April, 1898, and there discharged about sixteen hundred tons of her cargo. On the 20th of April she received from the steamer Alava, in the port of Havana, about twenty tons of general cargo destined for Santiago, which the latter vessel had brought from European ports and desired to tranship, the same never having been landed in Cuba. In the afternoon of April the 22d the steamer left Havana in continuance of her voyage. On that morning, in execution of an order received from the President, the American fleet left Key West for the Island of Cuba to establish and enforce a blockade of certain ports in the Island of Cuba which had been proclaimed by the President. The Pedro, some distance outside of the harbor of Havana, met the American fleet and was captured.

There is no just foundation, however, for the contention that in leaving the port of Havana the vessel was violating the blockade, for at the time of her sailing the blockade had

not been established. Indeed, when the capture took place the fleet was on its way to Havana for the very purpose of initiating the blockade ordered by the proclamation of the President. Whilst it is true that subsequently to the 22d of April Congress passed a resolution declaring that war should be considered as having been flagrant as of the date of the 21st of April, that it was not conceived or known when the vessel sailed from Havana on the 22d that a state of war existed is also demonstrated by the proof, which shows that just prior to the sailing of the Pedro from the harbor of Havana an American ship was allowed to depart from that port, and that shortly after the Pedro left an American steamer, which was likewise in the port of Havana, was also permitted to leave.

Under this state of fact it seems to me that the Pedro was within the exact requirements of the fifth article of the proclamation of the President of the United States, and hence was not subject to capture and condemnation. The article in question is as follows:

"5. Any Spanish merchant vessel which prior to April 21, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place, and to discharge her cargo, and afterwards forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voyage to any port not blockaded."

The theory from which it is deduced that the Pedro was not a Spanish merchant vessel "which prior to April 21, 1898," had "sailed from any foreign port bound for any port or place in the United States," is not by me understood. She assuredly sailed from Antwerp prior to the 21st of April, 1898; she certainly was bound for a port in the United States, since she was under a charter to American citizens, by the terms of which she was obliged "to proceed with all convenient speed" so as to arrive at Pensacola or Ship Island by May 5, 1898, where she was to take on an American cargo to be carried to the port of Rotterdam. The vessel beyond question took a bill of health from the American consul at Antwerp, describing her as one engaged in Atlantic trade, and plying between

Europe and the United States, and the American consul certified that she was leaving the port of Antwerp bound for Pensacola in the United States via Havana, Santiago and Cienfuegos. Under these conditions she came, in my conception, not only within the letter of the fifth article of the proclamation, but also within its plain intent. The object of the proclamation was to relieve Spanish merchant vessels coming in the regular course of a commercial voyage to our ports from, without warning and without opportunity of returning to a port of safety, being captured and condemned as prize of war in consequence of the breaking out of hostilities subsequent to the. inception of the voyage which the vessel was engaged in prosecuting. In this respect the proclamation was but a practical execution of the enlightened policy by which civilized countries, on the breaking out of hostilities, have relieved merchant vessels, coming to one or the other of the belligerent countries, from being subject to capture when, before the happening of war, they had undertaken a lawful voyage in the prosecution of purely commercial duties and relations. The scope of the proclamation is shown by a consideration of the fourth and the fifth clauses together, the one providing for the right of an enemy's vessel found in a port of the United States at a time covered by the clause, to load cargo and depart without molestation, even although bound to a port of the enemy, and the provision of the fifth article which protects from seizure and condemnation the merchant vessels of the enemy which had sailed bound for any port of the United States prior to the period mentioned in the proclamation.

But, it is said, when the Pedro left Havana on the afternoon of the 22d she was not bound for Ship Island or Pensacola in the United States, but was bound for Santiago, therefore she was on a voyage between two ports of the enemy, and was not within the fifth article of the proclamation. This, however, treats the voyage from Havana to Santiago as a new and wholly independent one from that which commenced at Antwerp. It disregards the fact that the vessel had sailed from Antwerp for Pensacola or Ship Island via Havana and the other ports named; it overlooks that the ship was under

express charter to American citizens, when she left Antwerp, to proceed to Pensacola or Ship Island, and it further ignores the certification by the consul already referred to. To treat the voyage from Havana to Santiago as a new and independent one, moreover, fails to give weight to the proof showing that the touching at the Spanish ports in the Island of Cuba was merely incidental to the main voyage from Antwerp to the United States. It also does not apply the cumulative proof arising from the long and regular course of business in which the ship had been engaged for nine years prior to her capture in making regular trips from ports in Europe to ports in the United States via designated ports in the Island of Cuba. The decisions of this court, also, I think, refute the contention that the ultimate termination of an outward voyage may be disregarded, in order to create a new voyage because of the touching of a vessel at an intermediate port. The rule, consecrated by the previous decisions of this court, according to my understanding, is that the real intention of a vessel as to her outward bound port is the determining factor in concluding whether in consequence of her voyage she is or is not subject to capture as lawful prize. In *The Joseph*, 8 Cranch, 451, 454, 455, the vessel being a merchant vessel of the United States, with full knowledge of the war (1812) between the United States and England, carried a cargo from St. Petersburg to London. After discharging the cargo at the latter point she started in ballast for New York, her home port, and was captured and proceeded against for the offence of trading with the enemy. The defence was that the voyage had terminated on the arrival of the vessel in London, and that from London to the United States she was on a new voyage, and therefore not subject to capture and condemnation for an offence committed on a previous voyage. The court, through Mr. Justice Washington, said:

" It is not denied that if she be taken during the same voyage in which the offence was committed, though after it was committed, she is considered as being still *in delicto*, and subject to confiscation; but it is contended that her voyage ended at London, and that she was on her return embarked

on a new voyage. This position is directly contrary to the facts in the case. The voyage was an entire one from the United States to England; thence to the north of Europe; and thence, directly or indirectly, to the United States. Even admit that the outward and the homeward voyages could be separated so as to render them two distinct voyages, which is not conceded, still it cannot be denied that the termini of the homeward voyage were 'St. Petersburg and the United States . . . It was, in short, a voyage from St. Petersburg to the United States by way of London."

In *The Circassian*, 2 Wall. 135, a vessel sailing from one neutral port directly to another port of the same character was condemned, because it was found that the real and ultimate destination of the ship was a blockaded port in the United States. In *The Bermuda*, 3 Wall. 514, a vessel with cargo from one neutral port to another neutral port was condemned, as it was held that the real object of the voyage was to transport contraband of war by the vessel from one neutral port to the other with the object and purpose of continuing the transportation from the neutral port, to which the vessel was consigned, into the United States through the lines of a lawfully established blockade, the court deciding that the real purpose and intent as to the ultimate destination of the ship and its contraband cargo should control in determining the legality of the capture. In speaking on the subject, through Mr. Chief Justice Chase, the court said (p. 553):

"It makes no difference whether the destination to the rebel port was ulterior or direct; nor could the question of destination be affected by transhipment at Nassau, if transhipment was intended, for that could not break the continuity of transportation of the cargo. The interposition of a neutral port between neutral departure and belligerent destination . has always been a favorite resort of contraband carriers and blockade runners. But it never avails them when the ultimate destination is ascertained. A transportation from one point to another remains continuous, so long as intent remains unchanged, no matter what stoppage or transhipment intervene."

Applications of this doctrine are contained in the following cases: *The Hart*, 3 Wall. 559; *The Springbok*, 5 Wall. 1; *The Peterhof*, 5 Wall. 28. I do not understand that in the opinion of the court now announced the cases just cited have been overruled. They stand, therefore, and must be reconciled with the decision made in this case. This being so, the doctrine, from my point of view, may now be thus summed up. Where there is a question as to the condemnation of a vessel as lawful prize, the fact that, between her point of departure and her point of ultimate destination, she has touched or unladen her cargo or a portion thereof at an intermediary port, will not be considered as breaking the continuity of the voyage or as destroying the ulterior destination, and therefore if that destination be unlawful the voyage will be continuous from the point of departure to such ulterior destination, and the vessel will consequently be condemned. These rules are subject to the following exceptions: Where it becomes necessary to disregard the foregoing principles as to ulterior destination they will be given no weight, and the voyage will be treated as having terminated at an intermediary point, and consequently the vessel will be condemned because the voyage was not continuous. The result being, in any event, to subject the vessel to condemnation.

It is, however, urged, conceding that the ultimate destination controls, and therefore that the stoppage at the intermediary port was of no consequence, as under the charter party the Pedro was bound to proceed to Pensacola, there to take on a cargo, to be delivered at Rotterdam, even under the doctrine of continuous voyage, her voyage must be treated as continuous from Antwerp via Havana, etc., to Pensacola, thence to Rotterdam; that is to say, the continuous voyage, as manifested by the charter party, was from Antwerp to Rotterdam via Pensacola, hence the ship was never bound for the United States. But this obliterates the manifest distinction between the outward and return voyage, which is apparent in the text of the fifth article of the proclamation.

Even conceding that from some points of view the round voyage, that is, both the outward and return trip, should be

considered as being continuous, such concession cannot in reason be the test for determining whether under the proclamation the vessel was *bound* for the United States. If it be held that both the inward and the outward voyage are to be taken under the proclamation as the criterion for determining whether a vessel was bound for the United States, it would follow that the proclamation had no relation whatever to any foreign ship, other than such a. ship bound to a port of the United States without the intention of departing, that is, with the intention of remaining in the port of the United States. The proclamation, however, provides that the vessels bound for the United States to which it refers "shall be permitted to enter such port or place, and to discharge her cargo, and afterward forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voyage to any port not blockaded." This plainly distinguishes between the voyage on which the vessel is bound for the port of the United States and the voyage to be undertaken by the vessel from the port of the United States to which she is bound back to her homeward or some other neutral port. To construe the proclamation so as to cause it to embrace only vessels bound for the United States without any purpose of thereafter departing, would exclude from its operation the entire class of vessels it was its purpose to protect from condemnation. The error of such a consideration becomes to my mind plain, especially when it is borne in mind that it is conceded on all sides that the proclamation should receive a liberal construction in favor of the public purpose which it embodies, and against the liability of innocent and unwarned private property to capture and condemnation.

It was strenuously argued at bar, and, as I understand the opinion of the court, it is now held, that the Pedro was not embraced within the fifth article of the proclamation because she did not have cargo for the United States. The object of the fifth clause of the proclamation, it was said, was to allow vessels with cargo bound for the United States to be free from capture, because it was the public policy of the United States, on the outbreak of war, to encourage the bringing in

of cargo. The text of the proclamation does not, however, support this contention. It declares that all vessels which "have sailed from any foreign port bound for any port or place in the United States shall be permitted to enter such port or place . . ." It does not say all vessels which have sailed with cargo, but that all vessels shall be so permitted. True it is that the proclamation also authorizes the vessel thus permitted to enter to discharge her cargo. But the mere adding to the permission to enter, the right to discharge cargo, cannot be taken as denying permission to enter, if there be no cargo to discharge. It cannot in any event be said that the proclamation in plain terms confers the privilege of safe entry only on vessels having cargo; and if it does not, then construction is required, and the rule is that a liberal construction must be applied in order to protect the innocent private vessel from capture and condemnation. This supposed theory of the desire to encourage the bringing in of cargo, upon which it is assumed that the fifth article of the proclamation rests, entirely discards or at least ignores the enlightened moral sense which the proclamation embodies, that is, the duty not to capture without warning merchant vessels bound to our shores previous to the outbreak of war, and substitutes for it what to me seems the sordid motive of a supposed gain to result from incoming cargo. In other words, in its last analysis, the contention that the proclamation contemplates only exempting a vessel from seizure which has cargo for the United States, really asserts that fair dealing and justice are embodied in the proclamation only so far as it was deemed that profit might be derived from being just, and no further. Such an interpretation of the proclamation, however, is refuted by its very terms, since its preamble declares that its object was to mitigate the wrongs of war in accordance with the practice pursued by enlightened and civilized nations. Aside from these considerations, the supposed advantage to be derived from allowing cargo to come in, when considered intrinsically, is without force. Under this theory, two vessels would depart on the same day from a foreign port; one bound to a port in the United States, with

cargo, under a charter to foreign citizens to convey their goods into this country; the second ship proceeding in ballast under charter to American citizens to proceed to the United States and there take cargo. The argument is that the vessel chartered to the foreigner and containing his goods in the execution of his contract would be exempt from capture, whilst the vessel sailing in order to carry out the contract made with and in favor of an American citizen would be subject to capture. But this contention as to cargo is not only in conflict with the text of the fifth article, but is also at war with another provision of the proclamation — that is, the fourth article. By that article a Spanish vessel found in a port of the United States, as therein stated, is not only allowed to depart, but is also accorded the privilege of taking on cargo and carrying it either to a neutral port or to a port of the enemy, if not blockaded, up to a stated date without molestation. But the language conferring the privilege of loading cargo contained in the fourth article, whilst really only permissive, must be construed as imperative, if the permissive privilege to discharge cargo in the fifth article be held an imperative one, for no distinction can be drawn between the two. The argument then comes to this, that the public policy of the proclamation deemed the coming in of cargo so important that it provided for the capture of all vessels sailing for ports of the United States prior to the commencement of war, if they did not have cargo, and that the same public policy considered the taking away of cargo from the United States so important that the privilege given in the fourth article to Spanish merchant vessels in our ports to depart could be availed of, provided only they took cargo away from the United States. An interpretation which gives rise to so unreasonable a contradiction seems to me to demonstrate its own unsoundness.

But all the considerations which are relied on as justifying the condemnation in this case seem to me to be fully answered by authority. Both the fourth and fifth articles of the proclamation of the President were almost word for word a reproduction of the British Order in Council of March 29, 1854,

issued at the outbreak of the Crimean war. In order that the identity of the two may be at once apparent they are both reproduced, in juxtaposition, in the margin.[1]

Under the Order in Council just alluded to, the Argo, a Russian vessel, and therefore a vessel of the enemy, sailed from Havana for Matanzas, Cuba, there to take on cargo for

---

[1] *President's Proclamation of April 26*, 1898 (30 U. S. Statutes at Large, 1770).

4. Spanish merchant vessels, in any ports or places within the United States, shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage, if, on examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term; Provided, that nothing herein contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage), or any other article prohibited or contraband of war, or any dispatch of or to the Spanish Government.

5. Any Spanish merchant vessel which prior to April 21, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place, and to discharge her cargo, and afterwards forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voyage to any port not blockaded.

*Order in Council, March* 29, 1854 (*Spinks Prize Cases, Appendix iii*).

Russian merchant vessels, in any ports or places within her Majesty's dominions, shall be allowed until the tenth day of May next, six weeks from the date hereof, for loading their cargoes and departing from such ports or places; and such Russian merchant vessels, if met at sea by any of her Majesty's ships, shall be permitted to continue their voyage, if on examination of their papers it shall appear that their cargoes were taken on board before the expiration of the above term; Provided, that nothing herein contained shall extend to or be taken to extend to Russian vessels having on board any officer in the military or naval service of the enemy, or any article prohibited or contraband of war, or any dispatch of or to the Russian Government.

\* \* \* \* \*

Any Russian merchant vessel which, prior to the date of this order, shall have sailed from any foreign port bound for any port or place in her Majesty's dominions, shall be permitted to enter such port or place and to discharge her cargo, and afterward forthwith to depart without molestation; and any such vessel, if met at sea by any of her Majesty's ships, shall be permitted to continue her voyage to any port not blockaded.

Great Britain. The departure of the vessel from Havana in ballast was prior to the date fixed by the Order in Council. After arriving at Matanzas she there took on cargo, and sailed from that port for Great Britain, subsequent to the date fixed in the Order in Council. She was captured, and the question of her condemnation was considered and decided by Dr. Lushington. It was held that the vessel was protected by the Order in Council, and she was released. Necessarily, under the facts stated, the ultimate end of the outward voyage to Great Britain, and not the intermediary port at which the Argo stopped, controlled; otherwise she would have been subject to condemnation. This follows, as the order in terms only protected Russian merchant vessels which had sailed prior to the date of the order. As the sailing for Great Britain from Matanzas was subsequent to the order, it necessarily results that the date of sailing relied upon as protecting was the date of the sailing from Havana, and not the subsequent departure from the intermediate port. So, also, the case necessarily decided that the presence of cargo was not essential to entitle the vessel to protection under the Order in Council, since the vessel sailed in ballast from Havana, and only departed from Matanzas, where the cargo was taken on, after the date of the order, and therefore at a time and under conditions which would not have protected her unless the antecedent conditions existing at the time of the sailing had been considered as determinative.

The language of Dr. Lushington, in passing upon the case, is to my mind so persuasive of the issues which arise upon this record, that I quote from it. He said (Spinks' Prize Cases, p. 53):

"This vessel did sail from the Havannah prior to the date of the Order; she sailed from Matanzas subsequently to the date of the Order. When she left the Havannah she was in ballast bound for Cork, according to the charter party.

"It has been contended that this Order in Council contemplated that the Russian vessel should have been laden at the date of the Order; but I find no words in the Order that would justify my putting so strict a construction upon it;

neither do I think that there are any words which impose the necessity of not touching at or taking a cargo at some other port than that where the voyage commenced. For instance, I apprehend that a vessel might have taken in a part of her cargo from one foreign port, having left that port prior to the 29th of March, and taken in another part of the cargo at another foreign port subsequently.

"The real meaning of the Order in Council, according to my view of it, is, that the vessel shall have sailed prior to the 29th of March, on a voyage to end in Great Britain, and I am clearly of opinion that this was one continuous voyage, the commencement of which was at the Havannah, and that the sailing from Havannah prior to March the 29th is a substantial compliance with the terms of the Order."

Some stress was laid in argument, and seems to be given weight in the opinion of the court, to the language of Dr. Lushington referring to the taking on of the cargo. But, clearly, from the text of his opinion, this language was used in relation to the argument presented to him, which was that although a vessel sailing in ballast, without cargo, prior to the date of the Order in Council, was admittedly within its purview, the Argo was not covered by it, because subsequent to the proclamation she took on her cargo at an intermediate port. In meeting this argument the question of cargo was referred to, and the whole purport of the Order was summed up in language which I again quote. It was as follows:

"The real meaning of the Order of Council, according to my view of it, is, that the vessel shall have sailed prior to the 29th of March, on a voyage to end in Great Britain, and I am clearly of opinion that this was one continuous voyage, the commencement of which was at the Havannah, and that the sailing from Havannah prior to March the 29th is a substantial compliance with the terms of the Order."

The sailing from Havana, thus decided to have been sufficient, I again remark, was in ballast and without cargo.

This construction of the Order in Council, I have said, should be persuasive, indeed, if it should not be held to have been adopted and ratified by the reproduction in the procla-

mation of the President of the very language of the Order in Council, so many years after that order had been thus construed by the British Admiralty tribunal.

Thinking that the condemnation of this ship under the circumstances disclosed by the record will subject innocent private property to condemnation without just cause, will deprive it of the protection afforded by the proclamation of the President, which, according to its terms, but carried out those commendable principles of honesty and humanity, enforced by all civilized nations on the outbreak of war, I am constrained to dissent.