NORTHWESTERN S. S. CO., Limited, v. TURTLE et al. (ROBERTSON et al., Interveners).

(Circuit Court of Appeals, Ninth Circuit. May 4, 1908.)

No. 1,475.

1. SEAMEN—CONTRACT OF HIRING—DEVIATION FROM VOYAGE NAMED IN SHIPPING ARTICLES.

Shipping articles for a voyage described as "from the port of Seattle to Shanghai, China, and such other ports and places in any part of the world as the master may direct," required the vessel after leaving the port of departure to proceed directly by the ordinary route to Shanghai, and to touch at no intermediate port unless the exigencies of the voyage required that she enter the same for coal, supplies, repairs, or other like reason, and where she proceeded by way of Dutch Harbor, Alaska, into the Okhotsk Sea, intending to make the port of Vladivostok with a cargo which was at the time contraband of war, she deviated from the voyage described in the contract, and the members of the crew were entitled to recover damages resulting from their exposure while caught in the ice, consequent upon such deviation to an unusual course in the winter, and from confinement after the capture of the vessel by a Japanese warship.

2. SAME—VARIANCE OF SHIPPING ARTICLES BY PAROL.

Under Rev. St. § 4511 (U. S. Comp. St. 1901, p. 3068), which provides that the shipping articles signed by a crew shall indicate the nature of the intended voyage, the shipowner cannot vary such articles by evidence of a verbal agreement, made at the time they were signed, that the voyage should be other than that described therein.

3. SAME—ACTION FOR BREACH OF CONTRACT—DAMAGES.

Evidence considered, and *held* to sustain the decree of a court of admiralty awarding damages to seamen for injuries suffered by reason of the deviation of the ship from the voyage designated in the shipping articles.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

For opinion below, see 154 Fed. 146.

In the month of January, 1905, at the port of Seattle, Wash., the appellees shipped as members of the crew of the steamship Tacoma for a voyage from that port "to Shanghai, China, and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States on Puget Sound, for a term of time not exceeding six calendar months." At that time, and for some time prior thereto, a state of war existed between Japan and Russia, and the Japanese government had declared the Russian port of Vladivostok closed to trade and commerce. Instead of Shanghai, the destination of the vessel was Vladivostok. The steamer carried a cargo of salt beef, intended for the Russian government, and contraband of war. The vessel, in attempting to reach Vladivostok by an unusual and indirect route, presumably for the purpose of avoiding capture by the Japanese, whose war vessels were then patrolling the waters in the usual course of vessels to Vladivostok, became wedged in the ice at a considerable distance northeast of Vladivostok, where she remained for a period of 41 days, during which she was at times in imminent danger of being crushed by the ice. Before she was finally extricated from the ice, she was captured by a Japanese man-of-war, a Japanese prize crew was placed on board, and she was taken to Yekosuka, a naval station near Yokohama. There the appellees were taken by the Japanese authorities from the vessel and brought to Yokohama, where the United States consul secured their release. They were then sent to Seattle on the Empress of China. Their wages were paid for the whole period of their absence from the port of shipping. They filed libels in personam against the appellant, the owner of the vessel, alleging in substance

the foregoing facts, and in addition thereto alleged that the appellant, notwithstanding the provisions of the shipping articles, at all times intended to, and did, without their knowledge or consent, dispatch the vessel upon a voyage from Seattle to Vladivostok; that while the steamship was wedged in the ice they suffered greatly from cold and exposure, and lack of proper food, and from mental strain and anxiety caused by the danger and fear that the steamship would be crushed by the ice; that they suffered humiliation by being made prisoners of war, and experienced discomfort and inconvenience because of the inferior quarters and insufficient food furnished them at Yokohama and upon the steamer Empress of China upon her voyage home. The appellee Moritz claimed damages on the further ground that by reason of such exposure to cold he contracted rheumatism, whereby he suffered greatly and was compelled to lie idle and to incur expenses in medical treatment. The appellee Raymond also testified to special hardships suffered, and to mental strain and anxiety, after leaving the vessel while she was caught in the ice, in his effort to find a station from which news of the dangerous condition of the others could be conveyed to the owners and news to his family that he still survived. The answers to the libels are substantially the same. They admit that while the vessel was lying in the harbor of Seattle, and was about to engage in a voyage from Seattle to Shanghai and return, the appellees signed shipping articles as above set forth; that on January 5, 1905, the vessel sailed from the port of Seattle, in accordance with the shipping articles, and pursued a northerly course. They denied the allegations of hardship and suffering set forth in the libels, and by way of affirmative answers alleged that it was announced to the appellees before leaving Seattle that the steamship would coal at Dutch Harbor, and that she would land her cargo at Shanghai, China, or such other port as might be required by the consignee, if any other port should be required by the consignee after touching any port where the master could get into correspondence with the consignee or its agent, or upon such orders as might be made before leaving the ports of the United States. On the issues so framed, a large amount of testimony was taken, and thereupon the District Court found in favor of the appellees, holding that there was a deviation from the voyage for which they shipped, that they had undergone suffering and hardship as alleged, and assessing their damages as follows: To Moritz, $1,000; to Raymond, $2,000; and to the remaining appellees, $200 each.

John P. Hartman, for appellant.

Daniel Landon, Ormsby McHarg, and Jesse A. Frye, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). Error is assigned to the finding of the District Court that there was a deviation from the voyage which was described in the shipping articles. The shipping articles described the voyage as "from the port of Seattle to Shanghai, China, and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States, on Puget Sound." To comply with these articles, the vessel, after leaving the port of departure, was bound to proceed directly by the ordinary route to Shanghai, and to touch at no intermediate port, unless the exigencies of the voyage required that she enter the same for coal, supplies, repairs, or other like reasons. Under those articles the vessel was not permitted to touch at any other or intermediate port for discharge of cargo before going to Shanghai. Deviation, as applied to the rights of seamen, is analogous to deviation in its application to marine insurance, although there may be deviations which would discharge underwriters that would not discharge seamen. In either case it is a voluntary departure, without necessity or reasonable

cause, from the regular and usual course of the specified voyage. The course taken by the vessel in the effort to reach Vladivostok was clearly a departure from the prescribed route. That it was voluntary is beyond question. The evidence shows that at the time when the shipping articles were signed the intention of the appellant was not to send the vessel to Shanghai, but to Vladivostok, for discharge of her cargo. In order to reach that port and avoid the danger of interception by the blockading fleet, the vessel was sent out of the usual course to that port, and northward through the Kurie Islands into the Okhotsk Sea.

The appellant argues that, because the shipping articles permitted the vessel, after going to Shanghai, to visit other ports, their proper construction would permit the visiting of other ports on the way to Shanghai; but such is not the law. Such articles have always been construed as requiring the vessel to visit the designated ports in the order named therein. United States v. Matthews, 2 Sumn. 470, Fed. Cas. No. 15,742; The Ship Moslem, Olc. 298, Fed. Cas. No. 9,875; Weiberg et al. v. The St. Oloff, 2 Pet. Adm. 428, Fed. Cas. No. 17,-357; Anon., Fed. Cas. No. 449. Not only was there deviation, but the crew were taken upon a voyage of a totally different nature from that for which they had shipped, and involving perils which were not incident to the voyage described in the articles. They were carried in the winter time far out of the usual course of a voyage to Shanghai, into a northern sea, full of ice, on a ship insufficiently supplied with provisions and fuel for their comfort, where they were subjected to hardships and perils not contemplated in the shipping articles, and were subject to capture and detention.

It is contended, however, that, if it should be found that there was deviation, the appellant is not liable, because the appellees knew that the vessel was to go to Vladivostok, and they consented to such a course. It would be enough to say, in answer to this, that the shipping articles cannot thus be varied by parol. It is the intention of the statute that the articles shall express the true nature of the voyage, and it is contrary to its policy to permit a variation of the articles by evidence of a verbal agreement made at the time when they were signed. Thompson et al. v. The Oakland, Fed. Cas. No. 13,971; The Triton, 1 Blatchf. & H. 282, Fed. Cas. No. 14,181. But the District Court found that this contention was not sustained by the preponderance of the evidence, and we find in the evidence no ground to question that conclusion. The appellant points to the clause in the articles which provides:

"Should vessel not return to United States, passage and wages of crew to be paid back to Seattle."

It is said that this was inserted in the articles because the appellees insisted upon it, and that this is strong proof that they knew where they were going. The appellant refers to the testimony of the appellee Raymond to show that he so understood the purport of that clause. His testimony, however, is not susceptible of that construction. He testified to a conversation with the chief engineer, shortly before the articles were signed, in which he said to that officer, "It is reported that you people are going to run the blockade," and the engineer answered,

"There is nothing in it." Raymond said, "I would not think of going if you are going to Vladivostok," and the engineer answered:

"We are not going to Vladivostok. We are going direct to Shanghai, and return. * * * The ship is going to Shanghai. There she will be sold to the Russians, and they will offer a big amount of money to stay upon the ship."

This would show that the clause so referred to in the shipping articles was inserted in view of a contemplated sale of the ship at Shanghai, and not with reference to the contingency of her capture in attempting to run the blockade. The evidence as a whole justifies the conclusion that the appellant carefully guarded the secret that the vessel was going to Vladivostok. Her clearance and health certificate, when leaving Seattle, were obtained under the pretense that she was bound for Shanghai. The portion of the freight bill on which the port of destination was entered was torn off. A false entry was made that the ship was bound for Shanghai in the ship's journal, in the deck journal, and in the engineer's journal. When the vessel was captured, there is evidence that the captain attempted to conceal the freight bill. The testimony of the first assistant engineer was that the chief engineer informed him that they were to go through La Perouse Strait, between Saghalin Island and Yezo Island, during the night, and that they were to be prepared to put out all the lights on the ship. The instruction given by the captain to the second mate after leaving Dutch Harbor was to head the log book "from Seattle to Shanghai, by way of Dutch Harbor." All these items of the evidence tend to show an intention to conceal the destination of the vessel and to deceive the appellees.

The appellant contends that there is no proof in the record that the appellees sustained damages, or damages in the amounts allowed by the District Court. There can be no doubt that during the period of their detention in the ice in the Okhotsk Sea the appellees experienced serious bodily and mental suffering. For 41 days they were surrounded by the ice. The weather was extremely cold, and there was insufficient fuel. Some of the men had their feet frozen. The vessel was often in imminent danger of destruction from the crushing force of the masses of ice, which was jammed against her on all sides. Sleep was often made impossible from the noise of the chafing of the ice cakes. The crew, including the captain, were in constant fear of being crushed. After they had been 22 days in this position, the appellee Raymond volunteered to go ashore for the purpose of reaching a telegraph station, in order to inform the owners of the perilous situation of the vessel and advise his family that he was still alive. From his story, which is briefly and modestly told, it is evident that the venture was an exceedingly difficult and dangerous one, and that he endured great suffering from cold and hunger. He went 18 miles over the ice to the shore. The ice was extremely rough in places; in other places it was broken. Nine times he testified he broke through to his arms, and was obliged to proceed with blistered and freezing feet and frozen clothing, which cracked and broke. The appellee Moritz had his feet frozen, and according to his testimony thereafter suffered severely from inflammatory rheumatism, induced by the extreme cold to which he was subjected. He showed that he had paid out the sum of $450

for a nurse, physician, and other expenses resulting from his illness. In view of the evidence, we find no ground for holding that the award allowed to any of the appellees by the District Court was excessive.

The decree is affirmed.