NEW YORK TRAP ROCK CORPORATION v. CHRISTIE SCOW CORPORATION et al.

THE GREYSTONE.

THE ALLENTOWN.

No. 71, Docket 20739.

Circuit Court of Appeals, Second Circuit.

Jan. 13, 1948.

---

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for Moran Towing Corporation, respondent-appellant, and Moran Towing & Transportation Co., Inc., respondent-appellant and claimant.

Reginald V. Spell, of New York City (John P. Carson, of New York City, of counsel), for Christie Scow Corporation, respondent-appellee.

Hagen & Eidenbach, of New York City (Henry C. Eidenbach, of New York City, of counsel), for libellant-appellee New York Trap Rock Corporation.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On December 13, 1944, New York Trap Rock Corporation chartered the scow "Greystone" to Christie Scow Corporation for an indefinite time in accordance with the terms of a written charter which provided in part that "charterer shall at all times while the scows are under charter hereunder take good care of the vessels and shall redeliver them and each of them in the same good condition as when received, reasonable wear and tear excepted."

At the beginning of the charter period, the scow "Greystone" was in good condition, having been overhauled and repaired in September 1944.

At some time prior to January 17, 1945, Christie Scow Corporation delivered the

scow "Greystone" to Moran Towing Corporation to be used in the transportation of ballast. Under this arrangement, Moran Towing Corporation gave all orders for the towing, loading and discharging of the scow. It was agreed that Moran Towing Corporation was not to be considered a charterer of scows furnished pursuant to this arrangement, but that it should be liable for its negligence.

Moran Towing & Transportation Company, Inc., is a corporation organized under the laws of the State of New York, and on January 21, 1945, operated and controlled the tug "Allentown."

On January 17, 1945, the scow "Greystone" loaded with a cargo of ballast was towed to Archer Daniels Pier 2, Edgewater, New Jersey, where the cargo was consigned. Unloading of the ballast commenced and on January 20, 1945, two-thirds of the ballast had been unloaded and placed in a steamer. The bargee of the scow "Greystone" was then informed that no further unloading would take place until another ship arrived. The weather report on the latter date stated as of 7:30 P. M.: "Large fields of floating ice observed all day in Upper Bay, Hudson and East Rivers."

On Sunday, January 21, 1945, the tug "Allentown"—on the order of the Moran Towing Corporation—shifted the "Greystone" and another scow from the south side of the Archer Daniels Pier 2 to the neighboring dock of the Valvoline Oil Company. As moored, the scow "Greystone" lay bow upstream parallel to the thread of the Hudson River with part of her bow and her entire starboard side extending beyond the end of Pier 4 and presenting an obstruction to ice floes that might be dragged along her starboard side by the tide. At the time the scow "Greystone" was shifted to the Valvoline dock, the weather was clear and cold, the tide was running ebb and there was a great deal of ice in the river. The United States Coast Guard reported ice conditions on Saturday, January 20, and Monday, January 22, as set forth in the margin: [1]

Inasmuch as it was Sunday morning and no work was expected on that day, the bargee of the "Greystone" after inspecting the scow and pumping the water out left the boat at about eleven o'clock and went ashore. At about 3:30 that afternoon the "Greystone" overturned and sank as the result of having her starboard side gouged out by ice for a distance of approximately 18 feet thereby letting in a large quantity of water.

The libellant brought this suit in admiralty against Christie Scow Corporation for injury to the scow. Christie impleaded Moran Towing & Transportation Company, Inc., and the tug "Allentown." The court decreed the "Allentown" and the Moran Towing & Transportation Company, Inc., primarily liable, and Moran Towing Corporation and Christie secondarily liable.

■ It is argued on behalf of the "Allentown" that there was no warrant for a finding by the trial court that the damage to the scow was due to the impact of floating ice in the exposed position in which the scow was left, but we feel no doubt that the showing of large quantities of ice floating in the Hudson River and the testimony of the surveyors of the damaged

---

[1] "Battery to Tarrytown: Some open water with frequent large ice floes moving with tide. Navigable with caution.

"Tarrytown to Iona Island: Mostly open water with scattered ice floes in midstream and new ice forming along banks.

"Iona Island to Newburgh: Heavy broken ice, bank to bank, moving on ebb tide. Possible congestion in gorge at West Point. Navigable to this point with assistance only.

"Newburgh to Kingston, 8 to 12 inches of ice, bank to bank.

"Kingston north: Frozen over from side to side."

\* \* \* \* \* \* \*

"Battery to Tarrytown: Mostly open water with light scattered ice floes.

"Tarrytown to Iona Island: Open water with field ice 1 to 3 inches thick moving with the tide. Navigable with caution by steel hulled vessels.

"Iona Island to Newburgh: Heavy broken ice 12 to 15 inches thick, with congestion in gorge at West Point. Navigable to this point with assistance only.

"Newburgh to Poughkeepsie: Broken ice, bank to bank.

"Poughkeepsie north: Frozen over."

vessel that the cuts in the sides of the scow looked as though made by ice warranted the inference reached that she was left in an unsafe berth and that ice caused the damage. Certainly it cannot be said that the findings of the judge were clearly erroneous. The contention that there was no place in the neighborhood of the Valvoline dock where it would have been safer to leave the scow lacks support. The judge found:

"16. There were other places reasonably near which would have been safe for the mooring of the 'Greystone.'"

John Kerwin, called as a witness for the libellant, testified that the Valvoline Pier was "no place" to leave the scow and added that there were "protected" slips other than the Archer Daniels piers near to the Valvoline dock. He said the Edgewater Coal Dock, which was about a mile below Archer Daniels, was such a protected place. He also mentioned the Warner Sugar Refining Company Dock about a half mile above Valvoline, and also Ford's and Spencer Kellogg's docks. In view of this testimony we cannot say that Finding 16, which we have quoted, was clearly erroneous. In other words, it was apparently reasonable and practical to have tied up the "Greystone" at some of these docks at which risk from injury by ice would have been avoided.

There was nothing to account for the sinking of the "Greystone" except the ice, and the surveyor who represented the interests of the "Allentown" was not called as a witness to contradict the surveyors who had attributed the loss and damage to gouging by ice floes. In the circumstances we regard the finding of the trial court that the tug left the scow in an unsafe berth not only as justified but as required by the proofs offered.

■■ It is argued that the libellant was at fault because the bargee of the scow failed to protest at the landing of his scow at Valvoline Pier 4 and left her unattended on the day when the accident happened. We think the tugmaster was a much better judge of what—because of stress of weather—was a safe berth for the "Greystone" than the bargee. Tucker v. Reading

Co., 2 Cir., 127 F.2d 527, 528. Moreover, we cannot hold that the danger of injury to the scow from floating ice was so evident to one of the limited experience and skill of a bargee as to render him or the libellant responsible for leaving the vessel at Valvoline Dock 4 during hours when he was not expected to have any work to do in connection with her loading or unloading. United States v. Carroll Towing Co., 2 Cir., 159 F.2d 169.

■ There is no doubt that Christie Scow Corporation was liable as charterer for the negligence of any person entrusted with the management of the scow. O'Donnell Transp. Co. v. M. & J. Tracy, 2 Cir., 150 F.2d 735. Accordingly that company was properly held secondarily liable for the negligence of the tug "Allentown" and Moran Towing & Transportation Company, Inc., by the order of which the scow was left in an unsafe berth. The following finding of the trial judge was justified by substantial evidence:

"12. On Sunday morning, January 21, 1945, the Moran Towing & Transportation Co., Inc., ordered the scow 'Greystone' and another scow to be moved from the south side of Archer Daniels Pier 2 to the north side of the pier. The captain of the tug 'Allentown' placed the scow at the end of a short pier nearby, known as the Valvoline Dock, with her bow upstream parallel to the river, with her entire starboard side extending beyond the end of Pier 4, presenting a clear obstruction to any serious amount of ice that might be dragged along her starboard side by the tide."

■ The decision that Moran Towing Corporation was secondarily liable cannot however be justified for there is no proof of negligence on its part. In its answer to interrogatories by that corporation Christie Scow Corporation filed the following statement:

"It was agreed that Moran Towing Corporation was not to be considered a charterer of scows furnished pursuant to this agreement, but that it should be liable for its negligence."

This relieved it from liability to Christie Scow Corporation other than for its negligence which was not shown.

318

For the foregoing reasons the decree is affirmed except as to Moran Towing Corporation, but reversed as to it against which no secondary liability should be decreed. A decree should be entered as so modified.